IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:           :   CHAPTER 7
                  :
THE S&Q SHACK, LLC,     :   CASE NO. 09-67151-JEM
                  :
Debtor.             :

## TRUSTEE'S MOTION TO SELL CERTAIN ESTATE ASSETS, AUTHORIZING THE GRANT OF RELEASES, AND FOR RELATED RELIEF

COMES NOW the Trustee, Paul H. Anderson. Jr. (the "*Trustee*"), duly qualified and acting. and shows the Court as follows:

### Background

1.   This case was filed against The S&Q Shack, LLC (the "*Debtor*") as an involuntary case under Chapter 7 of Title 11 of the United States Code (the "*Bankruptcy Code*") on March 19, 2009. After a trial on the involuntary petition, this Court entered its Order for Relief on August 27, 2010. The Debtor appealed this Court's Order for Relief. No stay pending appeal was sought or granted. On September 15, 2011, the United States District Court for the Northern District of Georgia affirmed this Court's ruling.

2.   On September 23, 2010, the undersigned was appointed as Trustee. On September 28, 2010, this Court entered an order approving the undersigned to also serve as counsel for the Trustee. On May 12, 2011, this Court entered an order approving the Trustee's retention of Paul A. Jones & Company, LLC as forensic accountant for the Trustee. Since that time, Mr. Jones has assisted the Trustee in understanding the asset sales and related transactions that preceded this case, and has worked with the Trustee to identify and evaluate various causes

of action against insiders and third parties that received the proceeds of the sales, and/or that may have engaged in other actionable conduct.

3.    Shortly after his appointment, the Trustee learned that an asset of this Estate was certain preferred units (the "***Preferred Units***") in RSPS Holdings, LLC ("***RSPS Holdings***"). RSPS Holdings is the entity that, through a series of pre-petition transactions that took place in January of 2009, acquired substantially all of the operating assets of the Debtor (the "***Pre-Petition Sale***"). These operations are known to the public as the franchisor of Shane's Rib Shack™, a chain of "fast-casual" bar-b-que restaurants located throughout the eastern United States. In short, through the Pre-Petition Sale, the Debtor sold the operations of the Shane's Rib Shack franchisor for cash, but also retained a minority equity stake in RSPS Holdings: the Preferred Units.

4.    For the past several months, the Trustee has been in negotiations with Edmonds Capital Fund I, LLC ("***Edmonds***") regarding its proposed acquisition of the Preferred Units. Edmonds holds a majority of the voting equity in RSPS Holdings, and expressed a desire to acquire the Debtor's remaining stake in RSPS Holdings, subject to certain terms and conditions.

5.    These negotiations were at arms'-length in all respects, with a fulsome exchange of documents and financial information, as discussed below. These negotiations have now come to a successful conclusion for the benefit of this Estate.

### Relief Requested

6.    By this Motion, the Trustee seeks the authority of this Court, pursuant to Section 363(b), (f), and (m) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), (i) to sell the Preferred Units to Edmonds for $375,000, net of $51,889 that the Debtor owes to the Shane's National Marketing Fund, (ii) for such sale to be

free and clear of all claims, liens, interests and other encumbrances, except as expressly set forth

below and in the attached Proposed Order, (iii) for any valid remaining liens or other

encumbrances to attach to the net proceeds of the sale, (iv) to release, in conjunction with the

sale. certain parties associated with Edmonds, RSPS Holdings, and/or the pre-petition Debtor,

and (v) to immediately consummate these matters by making any order on this Motion effective

immediately upon its entry.

       7.       Attached hereto as <u>Exhibit A</u> is the Purchase and Sale Agreement (the "*PSA*") as

well as various exhibits to the PSA pursuant to which these transactions will take place.  Set

forth below is a summary of the transactions, and the legal and factual bases therefor.

       8.       **The Sale**:  The sale price (the "*Sale Price*") for the Preferred Units is $375,000.

The Trustee and his accountant Mr. Jones have reviewed, subject to a confidentiality agreement,

audited financial statements for RSPS Holdings, and have spoken to representatives of Edmonds

regarding RSPS Holdings' operations and capital structure.  In light of this analysis, the Trustee

has determined that the Sale Price is fair and adequate for the Preferred Units.  In addition to

having done financial and other due diligence, the Trustee's decision was informed by the nature

of the Preferred Units--an illiquid. minority stake in a closely-held enterprise.  This impairs the

value of the Preferred Units.  The Trustee's decision was further informed by the precarious

nature of the U.S. economy.  While RSPS Holdings has performed reasonably well. the

restaurant business is volatile, as is consumer sentiment.  Consumers are watching their

discretionary budgets, and in recent months, many restaurant chains have entered bankruptcy,

including regional and national chains such as Sbarro, Perkins, Marie Callendar's, and Mrs.

Winner's Chicken & Biscuits. The Trustee believes it is in the best interests of the Estate to

monetize the Preferred Units now, and the Sale Price represents a reasonable sum.

9.      Moreover, the Preferred Units are subject to certain restrictions on their transfer, as is customary with closely-held companies.  In particular, other than (i) a transfer of Preferred Units by the Debtor as part of a sale of equity of RSPS Holdings owned by Edmonds in a transaction that has been initiated by Edmonds (i.e., customary tag-along rights and drag-along obligations), or (ii) a transfer by the Debtor to any of RSPS Holdings, Edmonds or an affiliate of Edmonds, and without regard to certain limited customary exceptions for transfers to affiliates, pursuant to the terms of RSPS' Securityholders Agreement, dated as of January 14, 2009 (the *"RSPS Securityholders Agreement"*), of which the Debtor is a party, the Debtor may not transfer any of the Preferred Units without the prior written consent of Edmonds (in its sole discretion).  In addition, RSPS Holdings' existing limited liability company agreement includes certain procedural requirements in connection with any transfer of Preferred Units to a person that is not already an owner of equity of RSPS Holdings, including a requirement to sign a joinder to such limited liability company agreement pursuant to which the applicable trustee would agree to be bound by all of the terms and obligations of RSPS Holdings' existing limited liability company agreement.  Accordingly, even if there were a market for an illiquid, minority stake such as the Preferred Units, the Trustee may not be able to sell the Preferred Units to other parties.  This further informs the Trustee's decision to sell the Preferred Units to Edmonds for the Sale Price.

10.      **Applying Certain Sale Proceeds:**  When the Debtor's transactions with RSPS Holdings were consummated in January of 2009 through the Pre-Petition Sale, the Debtor was required, post-closing, to reimburse the Shane's National Marketing Fund in the amount of $51,889.  This Fund is used to reimburse Shane's Rib Shack franchises/operators for regional and national marketing expenses that enhance the value of the entire brand.  This reimbursement

did not take place, and this is a claim against this Estate. Edmonds has made it a condition of this transaction that $51,889 be credited at closing against the claim of the Shane's National Marketing Fund. This will relieve the Estate of an undisputed claim, and at bottom, it is a key part of the deal with Edmonds, without which Edmonds would not be willing to pay the full Sale Price. The Trustee submits this is a reasonable term for this transaction.

11.    **Sale Free and Clear/Liens Attaching to Proceeds**: The Preferred Units are, as noted above, subject to transfer and related restrictions under RSPS Holdings' existing limited liability company agreement and the related RSPS Securityholders Agreement. These restrictions will remain as to the Preferred Units; Edmonds is acquiring the Preferred Units completely subject to these restrictions. However, to the extent there are any other liens on, claims against, interests in, or other types of encumbrances (collectively, any "*Liens*") on the Preferred Units, Edmonds is requiring that its acquisition be free and clear of such Liens pursuant to Section 363(f) of the Bankruptcy Code.

12.    The Debtor's schedules listed no secured claims or secured creditors. No party has filed a secured claim in this case, and no party has asserted in any claim or in other filing a specific claim against the Preferred Units or an interest of any kind in the Preferred Units. In an abundance of caution, the Trustee arranged for a complete lien search on the Debtor just prior to filing this Motion, reviewing the applicable databases and court records for any UCC filings, judgment liens, state tax liens, federal tax liens, or pending litigation. It appears that a Notice of Federal Tax Lien was filed on March 17, 2011, assessing $83,086.23 for the tax year ending December 31, 2006 (the "*Tax Lien*"). Otherwise, no other Liens exist.

13.    Section 363(f)(3) permits a sale free and clear of any interest of a third party where the sale price is greater than the value of any existing liens. Here, the net proceeds will be

in excess of $320,000, and the tax Lien is for $83,086.23. Section 363(f)(3) is satisfied. As is

customary in Section 363 sales, the Tax Lien, if valid, will attach to $83,086.23 in net proceeds.

In addition, this Tax Lien may or may not be valid. It was imposed in March of 2011, when the

automatic stay was pending. It may not be correct--the Trustee will have to investigate the

returns. And the government did not file a proof of claim in this case by the bar date, so it may

be invalid for that reason. The Trustee will review all these matters in due course. But for

purposes of this Motion, the Preferred Units may be sold free and clear of the Tax Lien under

Section 363(f)(4) as well, as the Tax Lien is in *bona fide* dispute. Accordingly, under both

Section 363(f)(3) and (f)(4), this sale may be free and clear of all Liens, including the Tax Lien,

and the Tax Lien, if ultimately a valid secured claim, will attach to $83,086.23 in proceeds.

14.    **Authority and Basis for Releases**: The Trustee and his accountant have

reviewed the Pre-Petition Sale, and the underlying transaction documents. The Trustee believes

no claims or causes of action exist against RSPS Holdings or Edmonds. Edmonds has required

that the Trustee release all claims of the Estate against RSPS Holdings and Edmonds, as well as

specified third parties that are affiliated with RSPS Holdings and Edmonds: Edmonds Capital,

LLC. J. Rice Edmonds, Shane's Rib Shack, LLC, and Petrus Brands, LLC. Given that the

Trustee's investigation has revealed no apparent claims against such parties, the Trustee believes

that granting releases to them in conjunction with the sale is a reasonable exercise of his

judgment, not harmful to the Estate's interest in pursuing potential wrong-doers and recipients of

voidable transfers, and in the overall interests of the Estate, in order to complete the sale.

15.    In addition, there are other parties as to which the Estate may have claims, which

may also receive the benefit of releases under this Motion. These three parties are Arlington

Capital Advisors, LLC ("***Arlington***"), Christopher Morocco ("***Morocco***") and Shane Thompson

("**Thompson**").  Arlington was involved in the Pre-Petition Sale.  Messrs. Morocco and

Thompson were employees and/or shareholders of the Debtor, and upon consummation of the

Pre-Petition Sale, became affiliated with RSPS Holdings.  Arlington received $400,000 of the

proceeds of the Pre-Petition Sale, for structuring and related fees.  The Trustee does not believe

this payment is voidable, as it would represent fees earned and paid contemporaneously with the

closing of the Pre-Petition Sale.  Messrs. Morocco and Thompson received and $60,816 and

$102,736, respectively, in and around the time of the Pre-Petition Sale and in the weeks

thereafter.  These payments were in respect of their equity interests in the Debtor.  The payments

to Messrs. Morocco and Thompson are likely voidable, as transfers to equityholders when the

Debtor was insolvent and/or not able to pay its remaining debts, as well as under related legal

theories and avoidance statutes.

16.     In order for Arlington, Morocco, and Thompson to receive a release, however,

they must submit to document requests and interviews by the Trustee and/or his designee.  See

PSA at Sections 8(c) and 8(d).  This will be very helpful to the Trustee and the Estate, and will

assist in allowing the Trustee to complete his investigation of the Pre-Petition Sale.  The Trustee

is prepared, in short order, to begin sending demand letters to parties that received the several

million dollars in proceeds of the Pre-Petition Sale.  Arlington, Morocco, and Thompson, as

parties on the inside of the Debtor during the months leading up to the Pre-Petition Sale, can

shed light on why the Debtor's other insiders allowed millions of dollars to leave the Debtor and

go to shareholders when large, valid claims against the Debtor still existed.  These entities can

also allow the Trustee to better understand the spiderweb of companies that comprise the

Byzantine "Raving Brands" empire--there are a great many companies, with curious purposes

and structures.  This is important not only for avoidance actions, but in understanding how

- 7 -

various affiliates, and creditors and insiders of those affiliates, received proceeds of the Pre-Petition Sale. In short, gaining these parties' cooperation is very important, and given that the Trustee believes there are no claims against Arlington, and only relatively small claims against Messrs. Morocco and Thompson, providing these releases is appropriate, helpful to the Estate, and a sound exercise of the Trustee's judgment.

17.    **Immediate Effectiveness of Order**: The PSA requires that the transaction close by November 15, 2011. The Trustee believes the timing of this Motion will allow for a hearing on November 1, 2011, and if this Motion is granted, with the automatic stay period, it may be tight to close by November 15, 2011. No party in interest will be harmed by immediate effectiveness, and the circumstances of this case warrant it.

**Notice**

18.    A copy of this Motion and Exhibit A, which includes the proposed form of Order, attached hereto will be served on the Debtor, all creditors, and the Office of the United States Trustee. The Trustee submits that no other or further notice is necessary.

WHEREFORE, the Trustee, as Movant, prays the Court grant this Motion and the relief sought herein, enter an Order substantially in the form attached hereto, and grant such other and further relief as the Court deems just and proper.

This 3rd day of October, 2011.

Paul H. Anderson, Jr.
Trustee in Bankruptcy
Georgia Bar No. 017825

Two Piedmont Center, Suite 315
3565 Piedmont Road, N.E.
Atlanta, Georgia 30305
404-495-5380

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "Agreement") is made and entered into as of October 3, 2011, by and between The S&Q Shack, LLC, a Georgia limited liability company ("Seller") and Edmonds Capital Fund I, LLC, a Delaware limited liability company ("Buyer"). Reference is hereby made to the Amended and Restated Limited Liability Company Agreement of RSPS Holdings, LLC, a Delaware limited liability company (the "Company"), dated as of January 14, 2009, as amended and/or restated from time to time (the "LLC Agreement"). Capitalized terms used herein but not otherwise defined herein shall have the meanings given to such terms in the LLC Agreement.

WHEREAS, on August 27, 2010, the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "Bankruptcy Court") granted an order for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") against Seller;

WHEREAS, on September 23, 2010, the Office of the United States Trustee appointed Paul H. Anderson, Jr. as Trustee in Bankruptcy of Seller (the "Trustee"), and on September 28, 2010, the Bankruptcy Court approved the Trustee's retention of Paul H. Anderson, Jr. as counsel to the Trustee; and

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, an aggregate of (i) 2,221,451 of the Company's Series A-2 Preferred Units, (ii) 2,920,887 of the Company's Series B-1 Preferred Units and (iii) 2,657,663 of the Company's Series B-2 Preferred Units (such Series A-2 Preferred Units, Series B-1 Preferred Units and Series B-2 Preferred Units, the "Purchase Units"), on the terms and subject to the conditions as further described herein.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, conditions and covenants herein contained, the parties hereto agree as follows:

1.    Defined Terms.  For purposes of this Agreement, the following terms have the following meanings:

"Governmental Entity" means individually, and "Governmental Entities" means collectively, the United States of America, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including any court.

"Lien" means any lien, pledge, claim, security interest, encumbrance or charge, restriction or limitation of any kind, whether arising by agreement, operation of law or otherwise, other than pursuant to the Securities Act or any other securities laws.

**Exhibit "A"**

"Sale Order" means an order of the Bankruptcy Court in substantially the form attached hereto as Exhibit A (or in such other form and substance as may be acceptable to Buyer, in its sole discretion) authorizing and approving the sale of the Purchased Units from Seller to Buyer on the terms and conditions set forth herein.

"Securities Act" means the Securities Act of 1933, as amended, and the rules promulgated thereunder.

"Securityholders Agreement" means that certain Securityholders Agreement, dated as of January 14, 2009, by and among the Company, Seller, Buyer and the other persons a party thereto.

"Shane's Marketing Fund" means the Shane's Rib Shack National Marketing Fund.

2.      Shane's Marketing Fund.  Seller hereby acknowledges that (i) Seller owes $51,889 to Shane's Marketing Fund, which amount was due and payable by Seller to Shane's Marketing Fund on or prior to January 14, 2009 (the "Payable to Shane's Marketing Fund") and (ii) a condition to Buyer's willingness to enter into this Agreement is that, upon the Closing, $51,889 of the Purchase Price (as herein defined) be paid by Buyer, on behalf of Seller, directly to Shane's Marketing Fund in order to satisfy in full Seller's obligation with respect to the Payable to Shane's Marketing Fund.

3.      Purchase and Sale; Closing.

(a)      Purchase and Sale of Purchase Units.  Subject to the terms and conditions of this Agreement, at the Closing (as herein defined), Buyer shall purchase from Seller, and Seller shall sell to Buyer all of the Purchase Units free and clear of any and all Liens (other than Liens contained in the LLC Agreement and the Securityholders Agreement) in exchange for an aggregate cash purchase price of $375,000 (the "Purchase Price").  On the Closing Date (as herein defined), Buyer will pay to Seller the Purchase Price by wire transfer of immediately available funds to one or more accounts as designated by Seller; provided that, notwithstanding the forgoing, as set forth in Section 2 hereof, on the Closing Date, Buyer shall (and Seller hereby directs Buyer to) pay $51,889 of the Purchase Price directly to Shane's Marketing Fund as payment in full of Seller's obligation to pay the Payable to Shane's Marketing Fund.

(b)      The Closing.  The closing (the "Closing") of the transactions contemplated by this Agreement shall take place at 10:00 a.m., Atlanta Georgia time (or such other time as may be agreed to by Buyer and Seller), on a date to be specified by Buyer and Seller (the "Closing Date"), which date shall be no later than five business days after satisfaction (or waiver) of the conditions set forth in Section 4 hereof (other than those conditions that are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions).  The parties anticipate that the Closing will take place via electronic exchange of funds and of documents (or release of original documents delivered in advance from escrow).

2

4.    Conditions to the Closing.

(a)    Conditions of Seller's Obligations at the Closing. The obligation of Seller to sell the Purchase Units to Buyer at the Closing shall be subject to the fulfillment at or prior to the Closing of each of the following conditions, any and all of which may be waived in whole or in part in writing by Seller:

(i)    Representations and Warranties. The representations and warranties of Buyer contained in Section 5 hereof shall be true, correct and complete, in all material respects, as of the date hereof and as of the Closing Date, and Seller shall have received a certificate dated as of the Closing Date and signed by Buyer to such effect.

(ii)    Compliance with Covenants. Buyer shall have performed, observed and complied, in all material respects, with all of its agreements, covenants and obligations under this Agreement that are to be performed by Buyer prior to or on the Closing.

(iii)    Mutual Release. Each of Buyer, Edmonds Capital, LLC, a Delaware limited liability company, J. Rice Edmonds, the Company, Shane's Rib Shack, LLC, a Delaware limited liability company and Petrus Brands, LLC, a Delaware limited liability company (collectively, the "Buyer Release Parties") shall have executed and delivered to the Seller a Mutual Release, dated as of the Closing Date, substantially in the form attached hereto as Exhibit B (the "Mutual Release").

(iv)    Governmental Order. No Governmental Entity shall have issued an order, decree or ruling or taken any action temporarily or permanently enjoining, restraining or otherwise prohibiting the transactions contemplated hereby.

(b)    Conditions of Buyer's Obligations at the Closing. The obligation of Buyer to purchase the Purchase Units from Seller at the Closing shall be subject to the fulfillment at or prior to the Closing of each of the following conditions, any and all of which may be waived in whole or in part in writing by Buyer:

(i)    Representations and Warranties. The representations and warranties of Seller contained in Section 6 hereof shall be true, correct and complete, in all material respects, as of the date hereof and as of the Closing Date, and Buyer shall have received a certificate dated as of the Closing Date and signed by Seller to such effect.

(ii)    Compliance with Covenants. Seller shall have performed, observed and complied, in all material respects, with all of its agreements, covenants and obligations under this Agreement that are to be performed by Seller prior to or on the Closing.

(iii)    Assignment of Membership Interest. Seller shall have executed and delivered to Buyer an Assignment of Membership Interest, dated as of the Closing Date, substantially in the form attached hereto as Exhibit C (the "Assignment of Membership Interest").

(iv)    FIRPTA Certificate. Seller shall have executed and delivered to Buyer (a draft of which Buyer shall prepare and deliver to Seller at least two business days prior to

3

the Closing Date) an affidavit by Seller, sworn under penalties of perjury and dated as of the Closing Date, certifying that Seller is not a foreign person pursuant to Section 1.445-2(b) of the Treasury Regulations.

(v)    Mutual Release.  Seller and the Trustee (in his capacity as the Trustee) shall have each executed, and delivered to the other parties thereto, the Mutual Release.

(vi)    Sale Order.  The Bankruptcy Court shall have entered a Sale Order, and no stay of the effectiveness of such Sale Order shall be in effect.

(vii)    Governmental Order.  No Governmental Entity shall have issued an order, decree or ruling or taken any action temporarily or permanently enjoining, restraining or otherwise prohibiting the transactions contemplated hereby.

5.    Representations and Warranties by Buyer.  Buyer hereby represents and warrants to Seller that:

(a)    Buyer is an "accredited investor," as defined under Rule 501 promulgated under the Securities Act.

(b)    Buyer has delivered to the Trustee (i) the audited consolidated balance sheets of the Company as of December 26, 2010 and December 27, 2009 and the audited consolidated statements of loss and members' deficit of the Company for the year ended December 26, 2010 and for the period from January 14, 2009 to December 27, 2009 (the "Audited Financial Statements") and (ii) the unaudited consolidated balance sheet of the Company as of June 12, 2011 and the unaudited consolidated income statement of the Company for the period from December 27, 2010 to June 12, 2011 (the "Unaudited Interim Financial Statements").  The Audited Financial Statements have been prepared in conformity with United States generally accepted accounting principles and fairly present, in all material respects, the consolidated financial position of the Company and its consolidated subsidiaries as of the dates thereof and the consolidated results of operations of the Company and its consolidated subsidiaries for the periods indicated.  The Unaudited Interim Financial Statements have been prepared, in all material respects, based on the Company's books and records in a manner consistent with the Company's past practice with respect to the preparation of interim financial statements and are subject to normal and recurring year-end adjustments.

(c)    Buyer has delivered to the Trustee a true and correct copy of the LLC Agreement and the Securityholders Agreement.

(d)    This Agreement and the transactions contemplated hereby have been duly authorized, executed and delivered by Buyer.

(e)    The execution, delivery and performance of this Agreement by Buyer does not and will not conflict with, violate or cause a breach of any agreement, contract or instrument to which Buyer is a party or any judgment, order or decree to which Buyer is subject.

(f)    This Agreement constitutes a valid and binding obligation of Buyer enforceable in accordance with its terms, except as such enforceability may be limited by:

4

(i) applicable insolvency, bankruptcy, reorganization, moratorium or other similar laws affecting creditors' rights generally, or (ii) applicable equitable principles (whether considered in a proceeding at law or in equity).

SELLER HEREBY ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY BUYER IN THIS SECTION 5 ARE IN LIEU OF AND ARE EXCLUSIVE OF ANY AND ALL OTHER REPRESENTATIONS AND WARRANTIES FROM BUYER, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OR ANY OTHER REPRESENTATIONS OR WARRANTIES ABOUT BUYER, THE COMPANY OR ANY OF THE COMPANY'S SUBSIDIARIES.

      6.    <u>Representations and Warranties by Seller</u>.  Seller hereby represents and warrants to Buyer that:

      (a)    Seller owns of record and beneficially the Purchase Units, which, to the best of Seller's knowledge, are free and clear of any Liens (other than Liens contained in the LLC Agreement and the Securityholders Agreement).

      (b)    To the extent any Liens on the Purchase Units exist (other than Liens contained in the LLC Agreement and the Securityholders Agreement), pursuant to the Sale Order, all such Liens shall attach to the Purchase Price (net of the Payable to Shane's Marketing Fund), and shall no longer encumber or otherwise attach to the Purchase Units.

      (c)    Upon entry of the Sale Order and Buyer's payment of the Purchase Price in accordance with the terms hereof, (A) Buyer shall acquire good and marketable title to the Purchase Units free and clear of any Liens (other than Liens contained in the LLC Agreement and the Securityholders Agreement) and (B) Seller will no longer own any Units or have any other ownership interest in the Company.

      (d)    Neither the execution and delivery of this Agreement nor the performance or consummation of the transactions contemplated hereby by Seller will result in the creation of any Lien (other than Liens contained in the LLC Agreement and the Securityholders Agreement) relating to the Purchase Units.

      (e)    This Agreement and the transactions contemplated hereby have been duly authorized (subject only to the entry of the Sale Order), executed and delivered by Seller.

      (f)    To the best of Seller's knowledge, the execution, delivery and performance of this Agreement by Seller does not and will not conflict with, violate or cause a breach of any agreement, contract or instrument to which Seller is a party or any judgment, order or decree to which Seller is subject.

      (g)    Subject only to the entry of the Sale Order, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms, except as such enforceability may be limited by: (i) applicable insolvency, bankruptcy, reorganization, moratorium or other similar laws affecting creditors' rights generally, or (ii) applicable equitable principles (whether considered in a proceeding at law or in equity).

(h)     Except as specifically set forth in Section 5 of this Agreement, Seller has not relied on any information provided or representations made by Buyer, the Company, any subsidiary of the Company or any other person in connection with this Agreement.

BUYER HEREBY ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER IN THIS SECTION 6 ARE IN LIEU OF AND ARE EXCLUSIVE OF ANY AND ALL OTHER REPRESENTATIONS AND WARRANTIES FROM SELLER, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OR ANY OTHER REPRESENTATIONS OR WARRANTIES ABOUT SELLER OR THE PURCHASE UNITS.

7.     <u>Further Assurances</u>.  From time to time following the Closing, each party hereto shall execute and deliver such other reasonably appropriate instruments of assignment, transfer and delivery and shall take such other reasonable actions as the other party hereto reasonably may request in order to consummate, complete and carry out the transactions contemplated by this Agreement.

8.     <u>Covenants</u>.

(a)     <u>Efforts to Consummate</u>.  Subject to the terms and conditions herein, each of Seller and Buyer agrees to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws, regulations or otherwise to consummate, and make effective as promptly as practicable, the Closing, including, without limitation, in the case of Seller, by taking all necessary actions as soon as reasonably practical after the date hereof (including, without limitation, by filing any and all necessary or desirable motions with, and attending any and all applicable hearings of, the Bankruptcy Court) in order for the Sale Order to be entered by the Bankruptcy Court as soon as reasonably possible after the date hereof.  In furtherance of the foregoing, Seller shall use commercially reasonable efforts to have a Sale Order be entered by the Bankruptcy Court as soon as reasonably possible after the date hereof.

(b)     <u>Public Announcements</u>.  Prior to the Closing, neither any party hereto, nor any of their respective agents or representatives will make any press release or public announcement concerning this Agreement or the transactions contemplated hereby, except as required by law or with the prior written consent of Buyer and Seller.  Notwithstanding the forgoing, Buyer acknowledges that Seller shall file a motion with the Bankruptcy Court describing this transaction and seeking its approval, and that Seller shall also attend and address the transaction at any hearings convened by the Bankruptcy Court.

(c)     <u>Interviews by the Trustee</u>.  If the Bankruptcy Court enters a Sale Order, then after the date such Sale Order is effective, but prior to Closing Date, Buyer shall request each of Arlington Capital Advisors, LLC ("<u>Arlington</u>") (by means of an individual representative of Arlington that is familiar with the January 2009 transaction between Seller and the Company), Christopher Morocco ("<u>Morocco</u>") and Shane Thompson ("<u>Thompson</u>"; and collectively with Arlington and Morocco, the "<u>Interviewees</u>") to each have a separate conference call with the Trustee and/or his designees (which conference call will be for up to five hours and the applicable Interviewee may have his or its counsel present and Buyer's counsel may be present) pursuant to which the Trustee and/or his designees will have the opportunity to interview such

6

Interviewee with such Interviewee answering questions from the Trustee to Interviewee's knowledge (but without any liability of Interviewee to the Trustee or Seller as a result of such interview). In addition, prior to the calls described in the preceding sentence, the Trustee may request the Interviewees to provide certain correspondence or other documents in their respective possession, custody or control relating to the January 2009 transaction between Seller and the Company and/or the disposition of proceeds thereof, and each Interviewee shall conduct a commercially reasonable search for such items and deliver them to the Trustee in advance of its respective call. To the extent any such Interviewee believes that any particular information, correspondence or other documents that would otherwise by provided by such Interviewee to the Trustee in answer to any of the Trustee's questions are subject to any confidentiality agreement to which such Interviewee is bound (other than a confidentiality agreement to which Seller is a party or under which Seller has any rights), such Interviewee shall so inform the Trustee. Seller hereby acknowledges and agrees that (i) Buyer cannot provide any assurance to Seller that any of the Interviewees will be willing to participate in any such conference call with Trustee, or deliver correspondence or other documents to Trustee and (ii) in no event will Buyer have any responsibility, liability or obligation to Seller or Trustee with respect to any matters that may be provided to Trustee, or otherwise be discussed, in any such conference calls.

(d)    Mutual Release. If any Interviewee participates in a conference call with the Trustee and delivers correspondence or other documents as described in Section 8(c) of this Agreement prior to the Closing, then Buyer and Seller hereby agree that, if desired by such Interviewee, such Interviewee will be added as an additional Buyer Release Party to the Mutual Release, but only if such Interviewee signs and delivers the Mutual Release in the same manner as the other Buyer Release Parties; provided that in no event will the Closing be conditioned on any Interviewee becoming a party to the Mutual Release.

9.    Termination of this Agreement.

(a)    Termination. This Agreement may be terminated at any time prior to the Closing:

(1)    by mutual written consent of Buyer and Seller;

(2)    by Buyer or Seller if the Closing has not occurred on or before November 15, 2011 (the "Termination Date");

(3)    by either Buyer or Seller if any Governmental Entity shall have issued an order, decree or ruling or taken any action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated hereby and such order, decree or ruling or other action shall have become final and nonappealable;

(4)    by Buyer in the event of a breach, in any material respect, by Seller of any representation, warranty, covenant or other agreement contained in this Agreement which cannot be or has not been cured on the earlier of (x) the 10th business day after the giving of written notice thereof by Buyer to Seller and (y) three business days prior to the Termination Date; or

7

(5)      by Seller in the event of a breach, in any material respect, by Buyer of any representation, warranty, covenant or other agreement contained in this Agreement which cannot be or has not been cured on the earlier of (x) the 10th business day after the giving of written notice thereof by Seller to Buyer and (y) three business days prior to the Termination Date.

(b)      Effect of Termination.  If this Agreement is terminated pursuant to Section 9(a) of this Agreement, (i) all rights and obligations of the parties hereunder shall terminate and no party hereto shall have any liability to any other party hereto, except for obligations of the parties hereto under this Section 9(b), which shall survive the termination of this Agreement and (ii) such termination shall not release any party hereto from any obligations or liabilities of such party hereto for any breach of this Agreement by such party hereto that occurred prior to such termination.

10.      Miscellaneous.

(a)      Successors and Assigns.  No party hereto shall assign any of its rights under this Agreement without the prior written consent of the other party hereto (and any attempted assignment without such consent shall be null and void).  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(b)      Survivability and Recovery for Representations and Warranties.

(i)      The representations and warranties of Buyer set forth in Section 5(b) of this Agreement, as well as any certificate delivered by Buyer to Seller at the Closing which certifies the representations and warranties of Buyer set forth in Section 5(b) of this Agreement, shall terminate upon the Closing.  All other representations and warranties set forth in this Agreement, as well as any certificate delivered to Buyer or Seller at the Closing which certifies such other representations and warranties, shall survive the Closing until the date three years after the Closing, except for the representations and warranties set forth in Sections 6(b) and 6(g) of this Agreement which shall not expire.

(ii)      Buyer hereby acknowledges and agrees that, notwithstanding anything contained herein to the contrary, after the Closing, Buyer shall not be entitled to recover any damages, losses, liabilities, obligations, interest or expenses from Seller in connection with, or arising out of any breach of any representation or warranty made by Seller in this Agreement or in any certificate delivered by Seller to Buyer at the Closing which certifies the representations and warranties of Seller set forth in this Agreement in excess of 10% of the Purchase Price.

(iii)      Seller hereby acknowledges and agrees that, notwithstanding anything contained herein to the contrary, after the Closing, Seller shall not be entitled to recover any damages, losses, liabilities, obligations, interest or expenses from Buyer in connection with, or arising out of any breach of any representation or warranty made by Buyer in this Agreement or in any certificate delivered by Buyer to Seller at the Closing which certifies the representations and warranties of Buyer set forth in this Agreement, in

8

each case, that survive the Closing, in excess of 10% of the Purchase Price. Seller further hereby acknowledges and agrees that, notwithstanding anything contained herein to the contrary, after the Closing, Seller shall not be entitled to recover any damages, losses, liabilities, obligations, interest or expenses from Buyer in connection with, or arising out of any breach of any representation or warranty made by Buyer in this Agreement or in any certificate delivered by Buyer to Seller at the Closing which certifies any representations and warranties of Seller set forth in this Agreement, in each case, that do not survive the Closing as provided in clause (i) of this Section 10(b).

(c)      Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(d)      Counterparts. This Agreement may be executed in separate counterparts (including by way of facsimile transmission or scanned pages) each of which shall be an original and all of which taken together shall constitute one and the same agreement.

(e)      Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the state of Delaware, without giving effect to any rules, principles or provisions of choice of law or conflict of laws.

(f)      Descriptive Headings. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(g)      No Third-Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any person other than the parties hereto and their respective successors and permitted assigns.

(h)      Entire Agreement. This Agreement constitutes the entire agreement among the parties hereto and supersedes any prior understandings, agreements, or representations by or among the parties hereto, written or oral, to the extent they related in any way to the subject matter hereof.

(i)      Amendment. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.

(j)      Jurisdiction; Waiver of Jury Trial.   Any litigation regarding this Agreement shall be subject to the exclusive jurisdiction of the Bankruptcy Court. **EACH PARTY TO THIS AGREEMENT HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF.**

(k)      No Strict Construction.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(l)      Expenses.  Each of the parties hereto will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

* * * * *

10

IN WITNESS WHEREOF, the parties hereto have executed this Purchase and Sale Agreement as of the date first written above.

THE S&Q SHACK, LLC

By:

Name: Paul H. Anderson, Jr.
Title:     Trustee in Bankruptcy

EDMONDS CAPITAL FUND I, LLC

By:

Name: J. Rice Edmonds
Title:   Managing Director

## <u>LIST OF EXHIBITS</u>

Exhibit A      Form of Sale Order
Exhibit B      Form of Mutual Release
Exhibit C      Form of Assignment of Membership Interest

EXHIBIT A    FORM OF SALE ORDER

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| | : | |
| THE S&Q SHACK. LLC, | : | CASE NO. 09-67151-JEM |
| | : | |
| Debtor. | : | |

**ORDER APPROVING ON TRUSTEE'S MOTION TO SELL CERTAIN ESTATE
ASSETS, AND AUTHORIZING AND APPROVING THE GRANT OF RELATED
RELEASES, AND GRANTING RELATED RELIEF**

Upon the Motion dated October 3, 2011 (Doc. No. ___, the "*Motion*") of the Trustee, Paul

H. Anderson. Jr. (the "*Trustee*") for authority, on behalf of the bankruptcy estate of The S&Q Shack,

LLC (the "*Debtor*") (i) to sell to Edmonds Capital Fund I, LLC (the "*Buyer*") the following units of

RSPS Holdings. LLC ("*RSPS Holdings*") which are owned by the Debtor: (a) 2.221,451 of RSPS

Holdings' Series A-2 Preferred Units. (b) 2,920,887 of RSPS Holdings' Series B-1 Preferred Units

and (c) 2.657,663 of RSPS Holdings' Series B-2 Preferred Units (collectively. the "*Preferred

Units*"), free and clear of all liens except as expressly set forth below, and (ii) to grant releases, in

conjunction with the sale of the Units, to certain parties affiliated with the Buyer and RSPS Holdings

and certain specified other parties. as set forth in the Motion (the "*Releases*"): and notice of the

Motion being proper. and no further notice being necessary; and after the hearing on the Motion held

on November 1, 2011: and finding that good and sufficient cause exists to grant the relief sought in

the Motion, and that the relief sought in the Motion is in the best interests of the Debtor's creditors
and the Debtor's estate; and further finding that the terms of the Buyer's acquisition of the Preferred
Units represents a fair and reasonable offer under the circumstances of this case, that the terms of
the acquisition, including (without limitation) the purchase price, the allocation of a portion of the
purchase price to the claims of the Shane's National Marketing Fund, and the Releases, were
negotiated at arm's length, and that the total consideration to be received by the Debtor's estate for
the Preferred Units and to grant the Releases is fair and reasonable, and constitutes fair consideration
and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent
Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under
the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the
District of Columbia; and further finding that the Buyer is not an "insider" or "affiliate" of the Debtor
(as each such term is defined in the Bankruptcy Code), and that neither the Trustee nor the Buyer
have engaged in any conduct that would prevent the application of Section 363(m) of the Bankruptcy
Code or cause the application of Section 363(n) of the Bankruptcy Code to the sale, the Releases,
and the transactions contemplated by the Motion, and thus the Buyer is entitled to the protections
afforded under Section 363(m) of the Bankruptcy Code as a good faith purchaser; and finding that
the sale is in the best interests of the Debtor's estate, creditors, and other parties in interest;
accordingly it is hereby:

ORDERED, that the Motion is granted; and it is further

ORDERED, that the Trustee is authorized to sell the Preferred Units to the Buyer on the
terms set forth in the Motion and its accompanying exhibits; and it is further

ORDERED, that the Trustee is authorized to provide the Releases set forth in the Motion and
the exhibits accompanying the Motion, and that upon the closing of the sale of the Preferred Units,
such Releases shall be fully binding and enforceable in all respects; and it is further

ORDERED, that the Trustee is authorized to take all other steps reasonably necessary to
effectuate the sale of the Preferred Units and the grant of the Releases; and it is further

ORDERED, that, upon consummation of the sale, the Buyer shall own the Preferred units free and clear of all Liens (as defined in the Motion), Claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances and interests (including any right, title, interest, ownership, indicia of title or ownership, right of possession, or other legal, equitable or possessory interest of any kind) (any such encumbrances or interests. "*Interests*") (subject only to applicable restrictions on transfer of the Preferred Units as expressly set forth in RSPS' existing limited liability company agreement and the related Securityholders Agreement of RSPS Holdings, dated as of January 14, 2009) pursuant to section 363(f) of the Bankruptcy Code; and it is further

ORDERED, that any Liens. Claims. or Interests (each as defined above) that are discharged as part of the sale of the Preferred Units shall attach to the proceeds of the sale of the Preferred Units in the same manner and priority as existed prior to the sale of the Preferred Units, but only in that manner, and this Order shall not enhance or grant any further rights to any holder of a Lien, Claim, or Interest to the proceeds of the sale of the Preferred Units than existed prior to the entry of this Order; and it is further

ORDERED. that if the closing of the sale of the Preferred Units occurs at any time after entry of this Order, then the Buyer, as a buyer in good faith of the Preferred Units, shall be entitled to the protections of Section 363(m) of the Bankruptcy Code if this Order or any authorization contained herein is reversed or modified on appeal; and it is further

ORDERED. that this Court retains exclusive jurisdiction to (i) enforce and implement the terms and provisions of this Order. as well as the terms of the documents attached as an exhibits to the Motion, and each of the agreements executed in connection therewith, (ii) compel delivery of the Preferred Units to the Buyer, (iii) resolve any disputes arising under or related to the sale of the Preferred Units, (iv) enjoin and adjudicate the assertion of any Lien. Claim, or Interest against the Buyer or in respect of the Preferred Units. and (v) interpret, implement and enforce the provisions of this Order: and it is further.

ORDERED, that this Order constitutes a final order within the meaning of 28 U.S.C. §
158(a); notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under
Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable
by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the
implementation of this Order, and that it shall be effective immediately upon its entry.

**[END OF DOCUMENT]**

**Prepared and Presented by**

Paul H. Anderson, Jr., Trustee
Georgia Bar No. 017825
Two Piedmont Center, Suite 315
3565 Piedmont Road, N.E.
Atlanta, Georgia 30305
404-495-5380

**PARTIES TO BE SERVED**

THE S&Q SHACK, LLC
CASE NO. 09-67151-JEM

Pursuant to BLR 9013-3(c)(2) of the Bankruptcy Court, the Clerk is requested to serve

copies of the attached Order, as entered, upon the following persons or entities at the following

addresses:

Howard D. Rothbloom, Esquire
The Rothbloom Law Firm
31 Atlanta Street
Marietta, Georgia 30060

Richard J. Storrs, Esquire
Mills Paskert Divers
The Peachtree Building, Suite 1500
1355 Peachtree Street
Atlanta, Georgia 30309

The S&Q Shack, LLC
Attn: H. Martin Sprock, CEO
1801 Peachtree Street, Suite 160
Atlanta, Georgia 30309

W. Brian Raftery
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

Blanchard Miller, Lewis & Styers, PA
1117 Hillsborough Street
Raleigh, North Carolina 27603

DLA Piper
One Atlantic Center
1201 W. Peachtree Street
Suite 2800
Atlanta, Georgia 30303-3450

McCranie & Burns, LLP
P.O. Box 3398
Gainesville, Georgia

The S&Q Shack, LLC
c/o Steven G. Hill, Registered Agent
3350 Riverwood Parkway, Suite 800
Atlanta, Georgia 30339

Daryl Dollinger, President
Raving Brands, Inc.
1801 Peachtree Road, Suite 160
Atlanta, Georgia 30309

Mark I. Duedall, Esquire
Hunton & Williams, LLP
Bank of America Plaza, Suite 4100
Atlanta, Georgia 30308-2216

Paul H. Anderson, Jr., Esquire
Law Offices of Paul H. Anderson, Jr.
Two Piedmont Center, Suite 315
3565 Piedmont Road, N.E.
Atlanta, Georgia 30305

Davis, Pickern & Seydel
285 Peachtree Center Avenue, Suite 2300
Atlanta, Georgia 30303

Hill, Kertscher & Wharton, LLP
3350 Riverwood Parkway
Suite 800
Atlanta, Georgia 30339

Middlebelt Plymouth Venture
17800 Laurel Park Drive, N
Suite 200 C
Livonia, Michigan 48152

Safeguard Business Systems
P.O. Box 88043
Chicago, Illinois 60680

The Color Spot
1225 Winchester Pkwy.
Smyrna, Georgia

Secretary of the Treasury
U.S. Department of the Treasury
1500 Pennsylvania Ave., NW
Washington, DC 20220

Shane's National Marketing Fd
Shane's Ribshack Marketing Acc
1425 Ellsworth Ind. Drive, NE
Suite 38
Atlanta, Georgia 30318

Sally Quillian Yates
United States Attorney for the
Northern District of Georgia
600 U.S. Courthouse
75 Spring Street, SW
Atlanta, Georgia 30303-3309

Douglas H. Shulman
Commissioner of Internal Revue Service
U.S. Department of the Treasury
1500 Pennsylvania Ave., NW
Washington, DC 20220

## EXHIBIT B

## MUTUAL RELEASE

THIS MUTUAL RELEASE (this "Agreement") is dated as of _____ ___, 2011, and is executed by (i) (A) Edmonds Capital Fund I, LLC, a Delaware limited liability company ("Buyer"), (B) Edmonds Capital, LLC, a Delaware limited liability company, (C) J. Rice Edmonds, (D) RSPS Holdings, LLC, a Delaware limited liability company, (E) Shane's Rib Shack, LLC, a Delaware limited liability company and (F) Petrus Brands, LLC, a Delaware limited liability company (collectively, the "Buyer Release Parties") and (ii) The S&Q Shack, LLC, a Georgia limited liability company ("Seller") and Paul H. Anderson, Jr., in his capacity as Trustee in Bankruptcy of The S&Q Shack, LLC ("Trustee," with Trustee and Seller collectively being the "Seller Parties").

WHEREAS, Seller and Buyer are parties to that certain Purchase and Sale Agreement, dated as of October 3, 2011 (the "Purchase Agreement") pursuant to which, on the date hereof, Buyer is purchasing from Seller the Purchase Units (as such term is defined in the Purchase Agreement) (such purchase, the "Purchase Transaction"); and

WHEREAS, the execution and delivery of this Agreement by the parties hereto is a condition to the closing of the Purchase Transaction.

NOW THEREFORE, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

1.      Release of the Buyer Release Parties by Seller.

(a)      In exchange for valuable consideration, the receipt and sufficiency of which is expressly acknowledged, the Seller Parties hereby irrevocably release each Buyer Release Party from any and all claims, actions, causes of actions, demands, liens, agreements, contracts, understandings, covenants, actions, suits, obligations, controversies, debt, costs, fees, dues, expenses, damages, judgments, orders and all other claims and liabilities of every nature and description, known or unknown, matured or unmatured, at law or equity, and whether or not contingent which the Seller Parties now have or ever had against any of the Buyer Release Parties (other than pursuant to the Purchase Agreement) (collectively, the "Seller Claims").

(b)      It is the intention of the Seller Parties in executing this Agreement that this Agreement shall be effective as a bar to the Seller Claims hereinabove mentioned or implied, and the Seller Parties hereby knowingly and voluntarily waive any and all Seller Claims. The Seller Parties expressly consent that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including those Seller Claims relating to unknown and unsuspected claims, demands, charges and causes of action (notwithstanding any state statute that expressly limits the effectiveness of a general release of the unknown, unsuspected and unanticipated claims), if any, as well as those Seller Claims relating to any other claims, demands and causes of action hereinabove mentioned or implied.

(c)     The Seller Parties acknowledge that they have executed this Agreement freely and without coercion, that they have been advised by counsel and that they have been provided with a reasonable period of time to consider the terms of this Agreement.

(d)     The Seller Parties further acknowledge and understand that the facts and perceived circumstances to which this Agreement relates may hereafter turn out to be other than or different from the facts and perceived circumstances now known or believed to be known. The Seller Parties assume such risk and agrees that this Agreement shall be in all respects effective and shall not be subject to termination or rescission by reason of such different facts or perceived circumstances.

(e)     The Seller Parties hereby acknowledge and agree that as a result of the releases set forth in this Section 1, no Buyer Release Party has any further liabilities or obligations to the Seller Parties other than any liabilities or obligations that Buyer may have to Seller pursuant to the Purchase Agreement.

2.      <u>Release of Seller by the Buyer Release Parties</u>.

(a)     In exchange for valuable consideration, the receipt and sufficiency of which is expressly acknowledged, each Buyer Release Party hereby irrevocably releases the Seller Parties from any and all claims, actions, causes of actions, demands, liens, agreements, contracts, understandings, covenants, actions, suits, obligations, controversies, debt, costs, fees, dues, expenses, damages, judgments, orders and all other claims and liabilities of every nature and description, known or unknown, matured or unmatured, at law or equity, and whether or not contingent which such Buyer Release Party now has or ever had against the Seller Parties (other than, solely in the case of Buyer, pursuant to the Purchase Agreement and/or the Assignment of Membership Interest (as such term is defined in the Purchase Agreement)) (collectively, the "<u>Buyer Related Claims</u>").

(b)     It is the intention of each Buyer Release Party in executing this Agreement that this Agreement shall be effective as a bar to the Buyer Related Claims hereinabove mentioned or implied, and each Buyer Release Party hereby knowingly and voluntarily waives any and all Buyer Related Claims.  Each Buyer Release Party expressly consents that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including those Buyer Related Claims relating to unknown and unsuspected claims, demands, charges and causes of action (notwithstanding any state or other statute or law that expressly limits the effectiveness of a general release of the unknown, unsuspected and unanticipated claims), if any, as well as those Buyer Related Claims relating to any other claims, demands and causes of action hereinabove mentioned or implied.

(c)     Each Buyer Release Party acknowledges that such Buyer Release Party has executed this Agreement freely and without coercion, that such Buyer Release Party has been advised by counsel and that such Buyer Release Party has been provided with a reasonable period of time to consider the terms of this Agreement.

(d)     Each Buyer Release Party further acknowledges and understands that the facts and perceived circumstances to which this Agreement relates may hereafter turn out to be

2

other than or different from the facts and perceived circumstances now known or believed to be known. Each Buyer Release Party assumes such risk and agrees that this Agreement shall be in all respects effective and shall not be subject to termination or rescission by reason of such different facts or perceived circumstances.

(e)     Each Buyer Release Party hereby acknowledges and agrees that as a result of the releases set forth in this Section 2, Seller has no further liabilities or obligations to such Buyer Release Party other than any liabilities or obligations that Seller may have to Buyer pursuant to the Purchase Agreement and/or the Assignment of Membership Interest (as such term is defined in the Purchase Agreement).

3.     <u>Entire Agreement; Assignment</u>.    This Agreement (i) embodies the complete agreement and understanding among the parties hereto and supersedes and preempts any prior understandings, agreements or representations by or among the parties hereto, written or oral, which may have related to the subject matter hereof in any way and (ii) shall not be assigned by any party hereto without the prior written consent of the other parties hereto and any attempted assignment without such consent shall be null and void.

4.     <u>Amendment; Waiver</u>.    No part of this Agreement may be changed except in writing executed by each of the Buyer Release Parties and the Seller Parties.  No breach of any provision of this Agreement may be waived unless such waiver is in writing and signed by the party hereto waiving such breach.  The waiver of a breach of any provision of this Agreement shall not be deemed to be a waiver of any other breach hereof.

5.     <u>Interpretation</u>.    Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provisions will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of, or further limiting the scope of, this Agreement.

6.     <u>Governing Law; Jurisdiction</u>.    This Agreement shall be governed by and interpreted in accordance with the domestic laws of the State of Georgia, without giving effect to any choice of law or conflict provision or rule (whether of the State of Georgia or any other jurisdiction) that would cause the laws of any jurisdiction other than the State of Georgia to be applied.  Any litigation regarding this Agreement shall be subject to the exclusive jurisdiction of the Bankruptcy Court (as such term is defined in the Purchase Agreement).

7.     <u>Counterparts; Facsimile and Email</u>.    This Agreement may be executed in any number of counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same agreement.   Facsimile counterpart signatures or counterpart signatures delivered by email, in each case, to this Agreement shall be acceptable and binding.

8.     <u>Specific Performance</u>.   Each person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement, and to

3

exercise all other rights granted by law.  All such rights and remedies shall be cumulative and non-exclusive, and may be exercised singularly or concurrently.

*******

IN WITNESS WHEREOF, the parties hereto have executed this Mutual Release effective as of the date first above written.

THE S&Q SHACK, LLC

By:_____
     Name:  Paul H. Anderson, Jr.
     Title:    Trustee in Bankruptcy

PAUL H. ANDERSON, JR., in his capacity as Trustee

By:_____
     Name:  Paul H. Anderson, Jr.
     Title:    Trustee in Bankruptcy

EDMONDS CAPITAL FUND I, LLC

By:_____
     Name:  J. Rice Edmonds
     Title:    Managing Director

EDMONDS CAPITAL, LLC

By:_____
     Name:  J. Rice Edmonds
     Title:    Managing Director

_____

J. Rice Edmonds

RSPS HOLDINGS, LLC

By:_____
    Name:
    Title:

[Continuation of Signature Page to this Mutual Release Agreement]

SHANE'S RIB SHACK, LLC

By:_____

    Name:

    Title:


PETRUS BRANDS, LLC

By:_____

    Name:

    Title:


**[NOTE: AS PROVIDED IN, AND SUBJECT TO, SECTION 8(c) OF THE PURCHASE AGREEMENT, EACH OF ARLINGTON CAPITAL ADVISORS, LLC, CHRISTOPHER MOROCCO AND SHANE THOMPSON MAY ALSO BECOME A PARTY TO THIS MUTUAL RELEASE AS AN ADDITIONAL "BUYER RELEASE PARTY".]**

## EXHIBIT C

**ASSIGNMENT OF MEMBERSHIP INTEREST**

THIS ASSIGNMENT OF MEMBERSHIP INTEREST (this "Assignment") is entered into as of [_____], 2011 by The S&Q Shack, LLC, a Georgia limited liability company ("Seller") in favor of Edmonds Capital Fund I, LLC, a Delaware limited liability company ("Buyer"). Reference is hereby made to RSPS Holdings, LLC, a Delaware limited liability company (the "Company").

Seller owns 2,221,451 of the Company's Series A-2 Preferred Units, (ii) 2,920,887 of the Company's Series B-1 Preferred Units and (iii) 2,657,663 of the Company's Series B-2 Preferred Units (such Series A-2 Preferred Units, Series B-1 Preferred Units and Series B-2 Preferred Units, collectively, the "Purchase Units" or the "Membership Interest").

NOW, THEREFORE, for the consideration described in that certain Purchase and Sale Agreement, dated as of October 3, 2011, by and between the Seller and Buyer (the "Purchase Agreement"), and for other good and valuable consideration:

1.  Seller hereby sells, transfers, assigns and conveys to Buyer all right, title and interest in and to the Membership Interest, free and clear of all Liens (other than Liens contained in the LLC Agreement and the Securityholders Agreement).

2.  This Assignment is in accordance with and is subject to all representations, warranties, covenants and agreements set forth in the Purchase Agreement. Nothing contained in this Assignment shall be construed to supersede, limit or qualify any provision of the Purchase Agreement. To the extent there is a conflict between the terms and provisions of this Assignment and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern.

3.  All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such capitalized terms in the Purchase Agreement.

IN WITNESS WHEREOF, the Seller has executed and delivered this Assignment as of the date first above written.


THE S&Q SHACK, LLC


By:   _____
      Name: Paul H. Anderson, Jr.
      Title:   Trustee in Bankruptcy

## CERTIFICATE OF SERVICE

I, Paul H. Anderson, Jr., certify that a true and correct copy of the **Trustee's Motion to
Sell Certain Estate Assets, Authorizing the Grant of Releases, and for Related Relief, and
the exhibit thereto** was served via United States First Class mail, postage prepaid and addressed
as follows:

Howard D. Rothbloom, Esquire
The Rothbloom Law Firm
31 Atlanta Street
Marietta, GA 30060

Richard J. Storrs, Esquire
Mills Paskert Divers
The Peachtree Building, Suite 1500
1355 Peachtree Street
Atlanta, GA 30309

The S&Q Shack, LLC
Attn: H. Martin Sprock, CEO
1801 Peachtree Street, Suite 160
Atlanta, GA 30309

The S&Q Shack, LLC
c/o Steven G. Hill, Registered Agent
3350 Riverwood Parkway, Suite 800
Atlanta, GA 30339

Daryl Dollinger, President
Raving Brands, Inc.
1801 Peachtree Road, Suite 160
Atlanta, GA 30309

Mark I. Duedall, Esquire
Hunton & Williams, LLP
Bank of America Plaza, Suite 4100
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-2216

W. Brian Raftery
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

Blanchard, Miller, Lewis & Styers, PA
1117 Hillsborough Street
Raleigh, NC  27603

Davis, Pickren & Seydel
285 Peachtree Center Ave.
Suite 2300
Atlanta, GA  30303

DLA Piper
One Atlantic Center
1201 W. Peachtree Street
Suite 2800
Atlanta, GA  30309-3450

Hill. Kertscher & Wharton, LLP
3350 Riverwood Parkway
Suite 800
Atlanta, GA  30339

McCranie & Burns, LLP
P.O. Box 3398
Gainesville, GA  30503

Middlebelt Plymouth Venture
17800 Laurel Park Drive, N
Suite 200 C
Livonia, MI  48152

Safeguard Business Systems
P.O. Box 88043
Chicago, IL  60680

Shane's National Marketing Fd
Shane's Ribshack Marketing Acc
1425 Ellsworth Ind. Drive, NE
Suite 38
Atlanta, GA  30318

The Color Spot
1225 Winchester Pkwy.
Smyrna, GA 30080

Sally Quillian Yates
United States Attorney for the
 Northern District of Georgia
600 U.S. Courthouse
75 Spring Street, SW
Atlanta, GA  30303-3309

Secretary of the Treasury
U.S. Department of the Treasury
1500 Pennsylvania Ave., NW
Washington, DC  20220

Douglas H. Shulman
Commissioner of Internal Revenue Service
U.S. Department of the Treasury
1500 Pennsylvania Ave., NW
Washington, DC  20220

This 3rd day of October, 2011.

Paul H. Anderson, Jr.
Trustee in Bankruptcy
Georgia Bar No. 017825

Two Piedmont Center, Suite 315
3565 Piedmont Road, N.E.
Atlanta, Georgia 30305
404-495-5380